May it please the Court, Counsel. My name is Brent Bryson. Assisting me today is John Thayer Clark. I'd like to spend ten minutes on my case in chief and reserve five minutes for purposes of rebuttal. You may do so. Just watch the clock, Counsel. Thank you, Your Honor. Your Honor, under a totality of the circumstances analysis, courts must consider the severity of the force and the need for the force. That's the Teckle case out of the circuit. Under Graham v. Connor, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene. That's Graham at 396. This Court in Billington v. Smith has stated that part of the objectively reasonable analysis takes into consideration what a reasonable officer would perceive. That's Billington at 1185. Your Honor, it's our position that at the time of shooting Jensen, Burnsides was operating under disabling mental and physical impairments, along with a lack of training that prevented him from perceiving the events as they transpired before him in an objectively reasonable manner. We are not stating that the test is not one of objectively reasonable, but under a totality of the circumstances analysis, this Court has indeed recognized in Porter under a higher standard of purpose to harm or intent to harm that what the officer was perceiving at the time that the events were unfolding goes to the analysis. I submit to this Court that there's only one standard of totality of the circumstances, whether you're using a higher standard under Porter or whether you're using an objectively reasonable standard under the Fourth Amendment analysis. Are you saying that because Burnside was subject to stress, he was unable properly to perceive that Jensen was not threatening him? I am saying that his perception was warped, Your Honor. Now, why do you say that? Was there any expert testimony as to the effect which stress has on the ability of a person who's under stress to understand what he's seeing? Well, actually- Was there any expert testimony on that issue? Not from a psychological standpoint. There was expert testimony from our police expert, which, by the way, was uncontradicted. There was no evidence from the police expert that was before the Court. But what we know that at the time that this event was unfolding is the following things. That Burnside had only been an officer for six months, EOR 146. We know that only two weeks prior to the shooting that Burnside was sent home because he was so stressed out he was physically ill and unfit for duty, EOR 235. On the very day that he shot Jensen, Burnside admits that he was so stressed out that he could not sleep and had physical problems, EOR 158. He couldn't sleep and he had diarrhea, right? That's correct. All right. But now get back to what I'm asking you. We hear about stress all the time, whether it's on the newspaper or on television or other means of communication. And what is stress and what stress does to people is not something which is known to the usual kin of jurors or even judges. My question is, if you're arguing that because of the stress Burnside couldn't appreciate that Jensen was not actually threatening his life, don't we have to have some expert testimony to tell us that? Actually, under the Ninth Circuit, as this Court is aware under the rules of evidence, I believe it's 702, you have to have evidence if it will assist the trier of fact. And I'm submitting to this Court that it is a general proposition. And that's not my total argument. It's a subpart of the argument. My total argument is this, that Burnside acted objectively unreasonable under an objective test. That's our test. I mean, stress might make him tired. Stress might give him diarrhea. But does stress – how do we come to the conclusion that stress stops him from seeing what other people would see? Well, because our expert, again, his testimony was uncontradicted, who has a long history and background in police. He's a cop. He's not a psychologist. That's correct. But even the other – I mean, do policemen testify as to what other policemen perceive, whether they're under stress or not? I don't think so. Well, again, Your Honor, if we simply take it into – incorporate that into the version that the district court accepted, it was a subjective analysis that the district court undertook instead of an objective analysis anyways. The version that the district court relied upon in granting summary judgment was this. I thought I was going to die. I thought he was going to take that taser away from me and use it on me and get my gun and shoot me. I thought I was going to get tased and sit there and watch him shoot me. EOR 165. He was prying the hands – the fingers of the officer off the taser, right? Well, perhaps. But also what he says is this. We have to take that into context again in the totality. What Burnside says is he's laying on his back and that Jensen is also laying on his back, back to chest, so we're stacked. We know that Jensen is handcuffed and he's laying back like this. You can imagine it on the floor. They're stacked. We know that Burnside is reaching around while our individual is handcuffed. And according to Burnside, he's got one wrist with one hand and he's prying fingers off with the other. That is not an objectively reasonable story, given the physical limitations of one's body. Now, it also – we know that the – It sounds like a jury argument to me. Well – pardon? It sounds like a jury argument to me. Well, again, that's the testimony that we are saddled with. That's what happened. And they want you to believe that that's reasonable. Our expert says that that's not reasonable. We also know that the service weapon – that Jensen had never gone for the service weapon. The service weapon was on the other side in a locked holster. And we know that whether Burnside's testimony was he was in a semi-unconscious or whether or not he was awake, one fact is clear. Jensen never went for the weapon. He never said he was going to kill him. He never had possession of any weapon. The most he had was in his mind a perception based upon when he got tased that if he got tased that Jensen would be able to get to his service revolver. Part of that totality of circumstances that I started my argument out with. Well, Counsel, why isn't this just like Billington? There was a struggle with – between the police officer and the plaintiff, and the police officer is clearly losing. Well, in Billington, first of all, we have multiple contradictions here as to the story.  And let me get to the contradictions very quickly, and then I will get to the exact difference, the distinguishment between Billington. In this case, the different versions of the story is that the fight first broke out when they were performing the intoxilizer test, standing up, that Burnside was attacked by Jensen. Then in another version, he's sitting at the desk. Jensen slips the cuffs, stands up, walks all the way around him, and from behind hits him. Now, we know that the first version could not be true, because after administering the intoxilizer test, they went on a run, a call, to the band room. And when they came back is when the incident happened, given the timings that are displayed on the taser. So we have a major inconsistency as to how this altercation started and began. And we also have differences in whether there was kicking or hitting, which is now directing me back to Billington. In Billington, the officer that showed up, as we know, showed up, had his daughter and his wife. And this court has said, well, just because you're negligent and you may engage in negligent tactics, not good enough. You have to have conduct which forms a predicate constitutional violation of the Fourth Amendment. And if you have that, then maybe even a reasonable use of force might become unreasonable. We believe that we have that here based upon money that is missing. But in Billington, what that officer had done also is when he approached this person, Billington got out, hit the officer several times with a flashlight, had actually grabbed onto the service revolver. Deadly force. A taser is not deadly force. As a matter of fact, by definition, it's an alternative to deadly force. And in this particular case, it was in drive stone mode, not even incapacitation, but drive stone, which is a pain compliance mode. But back to Billington, they're wrestling with this barrel that we know is deadly force. And he's attempting to turn it on the officer and had every intention that he was going to kill the officer or an officer could believe that. And that is when, in Billington, the officer shot Billington. In our case, there was at the time of shooting Jensen, Jensen, as I stated, was on his back. He wasn't trying to choke Officer Burnside. He wasn't trying to hit Officer Burnside. Officer Burnside is on his back. Jensen is on his back. Very limited. This could have all been avoided as simply because Officer Burnside, in the record, it is stated, he knew backup was on the way, like in Billington. But the difference is here, he could have pushed this taser away. That's how easy we could have avoided this situation. And even though the safety was on the taser, the picture shows that the taser was on safety, but he could have pushed it away and put Jensen in a bear hug and rode this out at that portion until backup arrived. Backup arrived so quickly after the shooting that they could still see smoke and smell powder. So getting back to the predicate unconstitutional act that we've alleged all the way through this, it was undisputed that at the time he was taken into custody that Jensen had $6,000 loan. The record before us reflects that only $500 and no jewelry, he also had jewelry, was recovered. The only person that was with him during this time and the only person that could have taken this money and jewelry, based upon circumstantial evidence, was the officer. He had it when he was taken into custody. From custody, he went to Williams Police Department. From there, he went on a drive to check out another call. Back to the Williams Police Department, the altercation occurs. He's shot dead. After they take an inventory, they only find $500 and none of the rings. The common thread and commonality there, which we're stating under Billington, gives rise to an independent constitutional violation is the wrong procedure in taking of the money by Officer Burnside, which would indeed explain why all of a sudden an altercation happened after Mr. Jensen had been compliant all day. There are people that are on death row, I would submit to this Court, on lesser circumstantial evidence. I can't stand before this Court and tell you exactly why. And this Court understands that because in Scott v. Henrick and in County of Maui, this Court understands that in cases like this, when there's really only one version being told, you must look to circumstantial evidence. And I think that's probably the most important thing that we have to do.      I think that's the best way to go about it. I think we have to do that. I think we have to do that. Thank you. Counsel, you're down to about two minutes. You wanted to reserve. I'll stop there unless there's a question. Very well. We'll hear from the appellees representing the officer. Thank you, Your Honor. Good morning. Eileen Gilbride on behalf of the defendants, Officer Burnside and the City of Williams. First, the material facts are not genuinely disputed. Counsel went off on whether there was a hitting or a kicking or whatever. As in Billington, these are not material facts. The material facts are these. Jensen outsized the officer. We know that. It's in the record. The two were alone in the sally port. Jensen attacked the officer. There is no dispute on that that Jensen was the aggressor. He engaged him in a struggle. He had him pinned. He was tased four times. The officer tried to tase him to get him off and get him to stop. That didn't work. Jensen was trying to pry his fingers off of the taser. The officer knew that if he was tased and incapacitated that he could be shot and killed, and he was afraid he would be. But, Counsel, isn't it a little difficult to have a material dispute when only one of the combatants survives? It may be. There was another witness, however, and that was the dispatcher, and she gave an affidavit that said, I saw them fighting. But she couldn't verify who was the aggressor. No, she couldn't. But there has to be some kind of evidence, some way, somehow, some admissible evidence that Jensen was the aggressor. Now, Counsel speaks of this money. There is no admissible evidence that Officer Burnside took money from Jensen. Is there evidence that the money was there when he was booked in? There is evidence that there was money in his pocket when he was arrested at the diner, that there were two big wads of money in his pockets, not in his money belt, in his pockets. There is no evidence from that point out on money. The only evidence. Was the money given to his family? There is no evidence on that. One way or the other? There is no evidence one way or the other. Was any claim made against the city for his belongings? Not that I know of, Your Honor, and certainly there's nothing in the record. If you look at the excerpt of record at page 258, this is what they're going on. Pictures. No foundation, but there is picture number 214 and picture number 215. Were they in the record? Were those pictures in the record? Yes. Yes. This is actually the record. Then it's part of the record. Yes, yes, yes. Didn't I say it was part of the record? Yes, but you said no foundation. There's no foundation for the pictures. They lack foundation. There's no evidence as to who took these pictures or that they indeed were from this case. Were they admitted by the court? Well, this was on summary judgment. But if they're part of the record and nobody objected to the lack of foundation or whatever, then they're part of the record. We did reply to their statement of facts, and I was remiss in not reviewing that last night. But let's say they're part of the record. Let's assume they're admissible. You have one picture of a money belt and one picture of money. It doesn't say anything about the two wads of bills, allegedly $4,000, that were in his pockets. This has to do with money belt. There's no evidence at all with respect to the money in his pocket. Well, wait a minute. If the photographs don't show the two wads, but the evidence was that he had the two wads at the cafe or whatever, can't one conclude that somebody took them from him? I don't think we can, Your Honor. I mean, you know, it's circumstantial evidence, isn't it? It's non-evidence. The plaintiff has to come up with evidence that that ---- He had the money. He didn't have the money. The only person he was with was Burnside. We don't know that he didn't have the money. All we know is that there are pictures. This doesn't purport to be pictures of things that were in his pockets. They're just pictures. We don't know what they are. We don't know what was in his pockets, and we don't know what happened to whatever was in his pockets. Where were these pictures? What was the source of these pictures? I don't know, Your Honor. There's no ---- That's why I say they lack foundation. When it was Exhibit 21, who proffered Exhibit 21? This was in the plaintiff's separate statement of facts in response to our summary judgment motion. There's no affidavit that goes along with it. There's no ---- It says, photos taken February 8, 2006, is what it says on there. Correct. Correct. And that was, I believe the shooting was on February 6, 2006. And they certainly could be part of this, but we don't know what they are. They don't purport to be all of the evidence. They don't purport to be everything that was on his person. There's no testimony about these pictures. They're just speculating that, oh, because there's a picture here of his money belt, therefore Jensen must have taken his money. There's no evidence that there was $4,000 on the officer. I mean, as counsel ---- You mean that the officer took Jensen's money. That's the officer. Yes, I misspoke. I'm sorry. And as counsel said, the backup officers arrived just as soon as Officer Burnside shot Jensen. There was still smoke. And Jensen, who was a 200-pounder and outweighed the officer, still had him pinned on the ground. There's no evidence. The officer was on the bottom. Jensen was on top of that. Jensen was on the top, back to front. So they were stacked, as counsel says. In any event, there really is no admissible evidence that Jensen was the ---- or that the officer, I apologize, Officer Burnside was the aggressor in this case. The only evidence is that Jensen attacked him. In fact, plaintiffs don't dispute that. They didn't dispute that in their statement of facts. Our statement of facts, paragraph 7, said that Jensen attacked the officer, and that was not disputed in their responding statement of facts. Well, when you have that, he's the aggressor, that officer tried to tase him, tried to fight him. He was losing the battle. He said to Jensen, Stop, or I will shoot you. And Jensen said, Go ahead, shoot me. That doesn't indicate to the officer, any reasonable officer, that Jensen's going to stop. That indicates to a reasonable officer, any objective officer, that his life is in danger. And that's exactly what our officer thought. So he found his weapon, he was able to get to his weapon, and he shot him in the back. Under these circumstances, and they're uncontroverted, any reasonable officer would find that Jensen posed a serious threat of serious harm and injury and death to our officer. As in Billington, the trial judge was correct in ruling that there was no constitutional violation on this basis. Even if the Court were to disagree, however, and find some constitutional violation that a reasonable, objective officer. Well, before you leave that, respond to your opposing counsel, Mr. Bryson's comment about the distinction of, the factual distinction with respect to Billington. There he tried to get the officer's weapon. There was no such showing here. He was busy trying to get the taser instead. Jensen was trying to pry Officer Burnside's fingers off of the taser, which was the next step, according to Officer Burnside's mind, to incapacitating him and then shooting him. Then he'd get the gun later. Yes, exactly. What's your response to opposing counsel's observation that the taser was on safety? Do you disagree with that? I don't recall the evidence on that. It may have been, but under Billington or one of the cases, and I can't remember if it's Billington or another, it doesn't matter if the weapon was on safety or not on safety because he could certainly put it, get the taser out of his fingers, take off the safety if it was, and incapacitate him. It was a reasonable fear. I mean, this is a minute, second by second, oh, my God, this guy is getting the best of me. He's already kicked me, punched me, gotten me on the ground, and pinned me down. He's going to kill me. And any reasonable officer would fear for his life and therefore use deadly force in that instance. Again, even if the court finds that there was a constitutional violation, as a matter of law, Officer Burnside would be entitled to qualified immunity. Now, the trial judge didn't get to this issue because he found no constitutional violation properly. If this court disagrees, however, again, and I don't want to keep repeating myself, but the issue is whether one reasonable officer out of the world of officers could believe that Officer Burnside's conduct was appropriate. Again, for the reasons I've stated, one could. And whether the law was clearly established. And again, when a suspect that outweighs you has got you pinned and is prying your fingers off the taser that you've just used to try to incapacitate him, it's not clearly established that it violates that suspect's constitutional rights to shoot him when you say, stop, stop, or I'll shoot you, and he's got you pinned and he says, go ahead, shoot me. Unless there are questions on those two issues, I'll move on to Monell very quickly. Because there was no constitutional violation, there can be no Monell liability against the city. But even if there were some constitutional violation, there is absolutely no evidence that Officer Burnside's reaction to being attacked was the result of some unconstitutional custom or policy. The policy is in the record. The policy says, don't use deadly force unless you are threatened and you feel that you're under serious threat of death or serious injury. He was, he did. And going back one more time to the stress. Yes, Officer Burnside said that he was stressed two weeks prior because of an incident with a different officer. A different officer did some things that Officer Burnside thought was not appropriate, and that's what made him stressed. There's no evidence. He asked his supervisor two weeks prior if he could leave because he was stressed about that incident, if he could go home sick. The supervisor said, fine, go home. He went home for two days. He came back, and there is no evidence whatsoever that he reacted to being attacked the way he reacted because of stress as opposed to because his life was threatened. Unless there are any other questions, I would simply ask the Court to affirm. Thank you, Counsel. Mr. Bryson, you have some reserved time. Thank you, Your Honor. Quickly, it's well established in the record that Mr. Jensen had multiple health problems with his back. That goes to the reasonableness of whether or not he, how this fight ensued and whether or not he was in an altercation. Well, pardon me. It's without any dispute that Jensen attacked Burnside and knocked him unconscious, correct? No, there is a dispute as to whether or not he was unconscious. There's a dispute whether or not if he was. Well, let's take that in two parts. First, you agree that Jensen attacked Burnside, not vice versa. I agree with that. Okay, fine. But you disagree that hitting Burnside over the head with his cuffs knocked Burnside unconscious. No, I disagree that that's one of the different versions that Burnside said. The first version was he was standing up performing the breathalyzer test when he was attacked. He didn't say he was knocked unconscious. The second version that the district court relied upon said that he was knocked semi-unconscious. Also, the fact that Jensen may or may not have said, shoot me. We know under Diorlee and Henrich that that in and of itself is not justification to shoot. Burnside admits that Jensen never went for his firearm, EOR-165. There's an admission. But he did go for the taser, or he's trying. It could have just as easily been he was trying to get the taser away so he couldn't be tased anymore. There is no evidence before this court that he was attempting. He never had a weapon in his hand. It's uncontradicted. Jensen never had any weapon or less or taser. Okay, but what are the facts? As I recall them, that he had his fingers on the taser and trying to grab it. Handcuffed. You've got to believe that handcuffed he's got a hold of a wrist. Right. And with the limited amount of strength you can have in your hand. I understand. A down like this is prying open the fingers. Right. And that that's reasonable. Okay. We also know that Burnside admits, this is EOR-165, that Jensen couldn't get his service weapon. Again, a distinguishment between Billington. On the issue of the Monell argument, the testimony and the evidence that we supplied establishes that the city of Williams' practice and custom of failing to train and supervise its officers evidence a great indifference which set in motion the events leading to the unlawful killing of Jensen. That's the memo that Crombeam wrote. It's also the testimony from Officer Crombeam. That's EOR-122 through 31. Absolutely, and counsel's right, the court, the district court found no constitutional violations, so we didn't have an opportunity to really go through the qualified immunity or the Monell argument. But basically, as this court is well aware, given Saussure v. Katz, Pearson v. Callahan, that which prong is now up to this court to determine which one it wants to tackle first, that the analysis under qualified immunity is, one, is there a constitutional right that was violated, and two, was the law clearly established? The law has been clearly established since Tennessee v. Garner that you cannot use excessive force on someone that is obviously in custody, and we do not believe that this is a reasonable mistake which would have allowed Burnside to assert qualified immunity. All right. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Rawlinson, Bea